## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

|  |  |
|---|---|
| THE DUTRA GROUP,<br><br>    Plaintiff,<br><br><br>       v.<br><br>NATIONAL LABOR RELATIONS BOARD, a federal administrative agency, WILLIAM B. COWEN, in his official capacity as the Acting General Counsel of the National Labor Relations Board, MARVIN E. KAPLAN, in his official capacity as the Chairman of the National Labor Relations Board, DAVID M. PROUTY, in his official capacity as Board Member of the National Labor Relations Board, JILL H. COFFMAN, in her official capacity as a Regional Director for the National Labor Relations Board, and JOHN DOE in his official capacity as an Administrative Law Judge of the National Labor Relations Board,<br><br>    Defendants, | Civil Action No. 1:25-cv-00090 |

## PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiff The Dutra Group, Inc. ("Dutra" or "Company") respectfully moves the Court pursuant to Federal Rule of Civil Procedure 65 for an emergency order temporarily restraining and/or preliminarily enjoining the ongoing administrative proceeding against Dutra, to be entered against Defendants National Labor Relations Board ("Board" or "NLRB"), NLRB Acting General Counsel William B. Cowen ("Cowen"), NLRB Chairman Marvin E. Kaplan ("Kaplan"), Board Member David M. Prouty ("Prouty") (Kaplan and Prouty, collectively, "Board Members"), NLRB

Regional Director Jill H. Coffman ("Coffman"), and Administrative Law Judge John Doe ("Doe") who will soon be assigned to preside over the administrative hearing.

On December 20, 2024, on behalf of the General Counsel for the NLRB, Coffman issued a Complaint and Notice of Hearing ("NLRB Complaint") alleging Dutra engaged in unfair labor practices in violation of the NLRA. The Notice of Hearing sets an administrative hearing to begin on July 8, 2025, and continue on consecutive days thereafter.

A deposition in the administrative proceeding against Dutra has been ordered to take place this Friday, February 28, 2025. Board's processes do not allow for regular discovery prior to an administrative hearing.

Without the requested relief, Dutra will suffer irreparable harm as described below.

## I.    INTRODUCTION

Dutra brought suit in this Court seeking declaratory relief and to enjoin Defendants from pursuing an unconstitutionally administrative proceeding against it. Dutra seeks a temporary restraining order and/or preliminary injunction to halt the underlying administrative proceeding while its suit is pending. Dutra will be able to demonstrate that it is entitled to injunctive relief.

The NLRB has accused Dutra of unfair labor practices in violation of federal labor law. The NLRB's administrative proceeding against Dutra violates the United States Constitution in four ways: (1) the NLRB's administrative law judges ("ALJs") are unconstitutionally insulated from removal; (2) the members of the Board are unconstitutionally insulated from removal; (3) Dutra is being deprived of its right to jury trial regarding purely legal remedies sought by the NLRB; and (4) the structure of the NLRB violates the separation of powers and Dutra's due process rights. There can be little doubt that Dutra will succeed on the merits of each of these claims based on binding Supreme Court and Fifth Circuit precedent. Indeed, courts in every other U.S. District Court of Texas have reached this very conclusion when they each granted a preliminary injunction

halting NLRB administrative proceedings. See *Space Exploration Techns. Corp. v. NLRB*, No. W-24-CV-00203-ADA, 2024 U.S. Dist. LEXIS 129439, at *9 (W.D. Tex. July 23, 2024) ("under current Fifth Circuit law, there is a substantial likelihood that SpaceX succeeds on the merits with regard to showing that the NLRB ALJs are unconstitutionally protected from removal"); *Energy Transfer, L.P. v. NLRB,* Case No. 3:24-cv-00198, doc. 49 (S.D. Tex. July 29, 2024); *Aunt Bertha v. NLRB*, Case No. 4:24-cv-00798-P, Docket No. 30 (N.D. Tex. Sept. 16, 2024).

Unless the Court enjoins the NLRB from continuing the proceedings at issue, Dutra will be irreparably harmed by these clear violations of its constitutional rights. The loss of constitutional freedoms, standing alone, "unquestionably constitutes irreparable injury" warranting preliminary injunctive relief. *BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021). But the harm here is even more significant and concrete. The harm of being subjected to a proceeding by unaccountable officials is a "here and now injury" as "it is impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). And, in addition to these constitutional harms, Dutra stands to suffer significant economic and reputational harm from these unconstitutional proceedings that distract from its important social service mission.

Finally, the balance of equities and public interest weigh in favor of granting a preliminary injunction where Dutra is seeking to stop "the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). It should go without saying that the public is best served when the government complies with Constitutional mandates.

This Motion presents ground for emergency relief due to the NLRB's ongoing unconstitutional proceedings, including the deposition that is set to be taken this Friday, February 28, 2025, and the approaching hearing date. Moreover, the NLRB will not face any hardship in

responding to this Motion on an emergency basis, as it has already briefed the same issues presented by this Motion to other Texas district courts.

For the reasons set forth herein, Dutra respectfully requests this Court grant its Emergency Motion for a Temporary Restraining Order and/or Preliminary Injunction.

## II.     BACKGROUND

### A.     Dutra's Operations.

Dutra is an industry-leading marine construction company that performs dredging and other marine construction projects in numerous ports, harbors, coastal areas, and other waterways throughout the United States. Declaration of Harry Stewart ("Stewart Decl."), at ¶ 4, attached as **Exhibit A**.[1] Dutra provides vital services like maintaining navigational channels, supporting coastal restoration, and managing flood control. *Id.* at ¶ 5. Much of the Dutra's work is on government contract projects for heavy and civil engineering construction. *Id.* at ¶ 6. The Company uses dredges, crane barges, tugboats, barges, scows, workboats, and other boats for these projects. *Id.* at ¶ 7. Most of Dutra's employees that work on its dredges, boats, and equipment are represented by various locals for the International Union of Operating Engineers ("Operating Engineers") and covered by agreements Dutra has entered into with the Operating Engineers. *Id.* at ¶ 8. The Company's dredges generally work on a project basis with various barges and boats utilized in support of the dredges depending on the location and needs of the project. *Id.* at ¶ 9.

Dutra operated a hopper dredge named the *Columbia* from in or around October 2009 until it was decommissioned in or around January 2023. *Id.* at ¶ 10.[2] During that period, Dutra and the International Organization of Masters, Mates & Pilots ("MM&P") entered into agreements

---

[1] *See also*, The Dutra Group, About Us, *available at* https://www.dutragroup.com/about-us/#values.

[2] A hopper dredge is a large self-propelled vessel and mostly a self-contained dredging operation. *Id.* Hopper dredges are most often used for dredging long and wide waterways such as harbor entrances and navigation channels. *Id.* By contrast, mechanical dredges are essentially barges with a crane. Mechanical dredges are typically used for work closer to a shoreline or in smaller or narrower waterways. *Id.* at ¶ 11.

regarding the terms and conditions of employment for personnel aboard the *Columbia*. *Id.* at ¶ 12. The Company's recognition of MM&P in their agreements was limited to personnel employed specifically aboard the *Columbia* and each agreement explicitly stated that it applied only to personnel employed aboard the *Columbia*. *Id.* The term of the last agreements between Dutra and MM&P expired on March 31, 2024. *Id.*

The *Columbia* worked on projects in several locations along the Gulf Coast, including, but not limited to, Galveston Harbor, Freeport Harbor, Brazo Harbor Island, and Sabine Neches. *Id.* at ¶ 13. At times, Dutra used its boats named the *Cape Anne* and *Gracie Jean* to ferry personnel and supplies from the nearest port to the *Columbia*.[3] *Id.* at ¶ 14.

**B.    The NLRB's Administrative Proceeding.**

Beginning in July 2023, MM&P filed a series of charges and amended charges with the NLRB alleging Dutra engaged in unfair labor practices in violations of the NLRA. Herman Decl. at ¶ 4. On August 1, 2024, in response to a request for evidence letter from the NLRB, Dutra submitted a position statement and supporting documentation refuting MM&P's allegations. *Id.* at ¶ 5.

On August 29, 2024, the Board agent investigating MM&P's allegations notified Dutra that the case had been submitted to the NLRB's Division of Advice ("Division of Advice"). *Id.* at ¶ 6. The Division of Advice is part of the NLRB General Counsel's staff and one of its responsibilities is to provide "legal advice to Regional Directors on all unfair labor practice cases involving novel or difficult legal issues ...." NLRB, Organization and Functions, Sec. 202.1 (1979).[4] On November

---

[3] A boat doing this type of work is commonly referred to as a crew boat or support boat. *Id.* at ¶ 15.
[4] The NLRB's Description of Organization is available at
https://www.nlrb.gov/sites/default/files/attachments/pages/node-165/nlrb-organization-and-functions-old.pdf

18, 2024, Dutra was notified that the Division of Advice had directed the Region to issue a complaint against Dutra. Herman Decl. at ¶ 7.

On December 20, 2024, on behalf of the General Counsel for the NLRB, Coffman issued a Complaint and Notice of Hearing ("NLRB Complaint") alleging Dutra engaged in unfair labor practices in violation of the NLRA. *Id.* at ¶ 8; *see* NLRB Complaint attached hereto as **Exhibit C**. The Notice of Hearing provides that a hearing will be conducted before an ALJ of the NLRB on July 8, 2025, and on consecutive days thereafter. Herman Decl. at ¶ 8; Exh. C at p. 8.

The NLRB Complaint alleges, among other things, that MM&P is the exclusive collective-bargaining representative under Section 9(a) of the NLRA for a unit of employees which included boat operators servicing a dredge named the *Columbia* and other dredges. Herman Decl. at ¶ 9; Exh. C. The NLRB Complaint claims that Dutra engaged in unfair labor practices in violation of the NLRA when it allegedly laid off the boat operators in the unit, refused to bargain with and withdrew recognition of MM&P as their exclusive collective-bargaining representative, and granted recognition to the Operating Engineers and transferred the boat operators work to employees represented by the Operating Engineers. Herman Decl. at ¶ 9; Exh. C. Dutra filed its Answer and Affirmative Defenses to the NLRB Complaint on January 17, 2025. Herman Decl. at ¶ 10; *see* NLRB Public Administrative Docket, 20-CA-322903, attached hereto as **Exhibit D**.

On February 6, 2025, Coffman issued an order and notice for the deposition of a witness to be conducted via videoconference before a Field Attorney designated as her representative and a court reporter. Herman Decl. at ¶ 11. Coffman issued that order after receipt of an application filed by the same Field Attorney requesting to take the deposition. *Id.*

On February 20, 2025, Dutra filed a motion to vacate Coffman's order or, in the alternative, to suppress the deposition. *Id.* at ¶ 12. Dutra's motion was made on the following grounds:

(a) Coffman, as a Regional Director of the NLRB, lacked statutory authority to issue her order in the absence of a quorum of members of the Board; (b) the order furthered the unconstitutional nature of the NLRBs procedures and proceedings; (c) the order was based upon an application to take a deposition that failed to comply with the requirements of Section 102.30 of the NLRB's Rules and Regulations. *Id*. In concluding its motion, Dutra stated:

> Even if those statutory and constitutional grounds for granting the motion are set aside (which they should not be), at a minimum, the [February 6] Order should be vacated for the Application's failure to comply with the requirements of Section 102.30 of the Board's Rules and Regulations. While those deficiencies can be remedied by the General Counsel, Charging Party, or [the witness] himself filing a proper application, the specific requirements of Section 102.30 cannot be ignored. As a rarely-granted exception to prehearing discovery that is not ordinarily allowed in Board proceedings, the Board established procedures specifying the requirements and standards to obtain depositions. Those requirements and standards were not met.

*Id*.

On February 25, 2025, last night, Coffman issued an order to withdrawal her February 6 order. *Id*. at ¶ 13. In relevant part, it states: "At the request of both parties, I am hereby withdrawing my Order Granting Request To Take A Deposition." *Id.*

Promptly upon receipt of Coffman's February 25 order, Dutra sought assurances from the Region, Field Attorney, and MM&P that there is no intent to file a new application to take the deposition that had been previously ordered by Coffman. *Id*. at ¶ 14. Dutra also sought confirmation from Coffman that, if a new application were to be filed, it would be subject to the requirements of Section 102.30 of the NLRB's Rules and Regulations, including, without limitation, that the application must be served not less than 7 days prior to the time when it is desired that the deposition be taken. *Id.*

Because Coffman's February 25 order did not grant Dutra's motion (or rule on the grounds set forth therein regarding her lack of statutory authority without a quorum of Board members or

a deposition furthering the unconstitutional nature of the NLRB proceedings), it does not foreclose the threat that another order for the taking of a deposition might be issued upon another application being filed. *Id.* at ¶ 15.

### C.    The NLRB under President Trump.

The NLRB Complaint was issued prior to President Trump taking office on January 20, 2025.[5]  When the Division of Advice directed the Region to issue the NLRB Complaint, the General Counsel for the NLRB was Jennifer Abruzzo ("Abruzzo"). On January 28, 2025, Abruzzo was removed from her position.[6] *See* Exh. , Attachment A. On the same day, President Trump also directed the removal of Gwynn A. Wilcox ("Wilcox") as a member of the Board. *Id.* Wilcox has filed a lawsuit contesting the President's authority to remove her as a member of the Board, *see Wilcox v. Trump et al.*, 1:25-cv-00334 (D.D.C.), and that issue remains a matter of dispute. As a result of Wilcox's dismissal, the Board presently lacks a quorum of members for it to act under the NLRA. *See* Exh. F (filing on behalf of NLRB recognizing that "the Board now lacks a quorum of members to review ALJ-recommended findings and order in the underlying unfair-labor-practice proceedings ….").

In addition, the President's letter regarding the removal of Abruzzo and Wilcox stated, in relevant part:

> Article II of the U.S. Constitution vests the entire executive power in a single President, who alone is accountable to the people. Pursuant to my constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, §3, I must ensure that those who wield executive power on my behalf are held

---

[5] The President of the United States as an office vested with executive power by Article II of the U.S. Constitution is herein referred to as the "President." For clarity, "President Trump" is used herein when referring to actions, statements, or positions taken by or on behalf of President Donald J. Trump

[6] As of the date of this Motion, the removal of Abruzzo as General Counsel of the NLRB has not been challenged and the President's authority to remove the General Counsel of the NLRB has been upheld by the Fifth Circuit and other Circuit Courts of Appeal. *Exela Enter. Sols., Inc. v. NLRB.,* 32 F.4th 436, 445 (5th Cir. 2022)("President Biden lawfully removed former-General Counsel Robb without cause[.]"); *see e.g., NLRB v. Aakash, Inc.*, 58 F.4th 1099, 1104 (9th Cir. 2023) ("[T]he President may remove the Board's General Counsel at any time and for any reason.").

accountable. Of particular importance, heads of agencies within the Executive Branch must share the objectives of my administration and its commitment to serving the will of the American people.

In my judgment, the National Labor Relations Board is not presently fulfilling its responsibility to the American people. The NLRB wields immense executive power over private employment relationships and relations with unions—an area with vast economic consequences.

The aims and purposes of the Administration with respect to the work on the Board can be carried out most effectively with personnel of my own selection. To that end, effective as of this date, Gwynne A. Wilcox … [is] hereby removed from the office of Members of the National Labor Relations Board.

*See id*. The President's letter clearly expresses his view that the Abruzzo as General Counsel and the previously composed Board with Wilcox as a member did not share the objectives of his administration and that replacement with "personnel of [the President's] own selection" is required for the NLRB to carry out its work consistent with the aims and purposes of the President's Administration. *Id.*

On February 3, 2025, the President appointed Cowen was appointed Acting General Counsel of the NLRB. *See* NLRB Office of Public Affairs, President Trump Appoints Williams B. Cowen Acting General Counsel of the National Labor Relations Board (February 3, 2025), available at https://www.nlrb.gov/news-outreach/news-story/president-trump-appoints-william-b-cowen-acting-general-counsel-of-the. On February 14, 2025, Cowen rescinded numerous memoranda issued by Abruzzo, including, but not limited to, memoranda regarding submissions to the Division of Advice. *See* Memorandum GC 25-05 (Feb. 14, 2025), available at https://apps.nlrb.gov/link/document.aspx/09031d4583f3f58c. Cowen cited the growing backlog of cases being "no longer sustainable" and announced his intention to assist the Regions by issuing further guidance on appropriate allocation of the NLRB's resources. *Id.*; *see also* NLRB Office of Public Affairs, GC-25-05 Rescission of Certain General Counsel Memoranda (Feb. 14, 2025),

https://www.nlrb.gov/news-outreach/news-story/gc-25-05-rescission-of-certain-general-counsel-memoranda

Additionally, in a pending case in another federal district, Defendants (excluding Coffman, who is not a defendant in that case) recently notified the court that they are no longer contesting "that the statutory restrictions on removing NLRB Board members and administrative law judges are constitutional." *See* Notice of Modified Position, *Loren Cook Co. v. NLRB*, 6:24-cv-03277-BCW (W.D. Mo. Feb. 21, 2025), ECF No. 60 (informing the court that "[t]his is consistent with the position of the Acting Solicitor General" and citing Notice of Change in Position at 1, *Express Scripts, Inc. v. FTC*, No. 4:24-cv-1549-MTS (E.D. Mo. Feb. 15, 2025), ECF No. 57)., attached hereto as **Exhibit G**.

## III.    ARGUMENTS

To obtain a preliminary injunction, Dutra must show: (1) it is likely to succeed on the merits of its constitutional claims; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Dutra will succeed on all four elements.

### A.    <u>Dutra is Likely to Succeed on the Merits of the Constitutional Claims.</u>

#### 1.    **NLRB Board Members are unconstitutionally insulated from removal.**

Article II of the Constitution states that the President must "take care that the Laws be faithfully executed." U.S. Const. art. II, § 3, cl. 3. The President has the power to appoint NLRB Board members. *See* 29 U.S.C. § 153(a). The NLRB consists of five Board members. *Id.* With the advice and consent of the Senate, the President of the United States appoints these Board members to staggered, five-year terms. The President designates one Board member to serve as the

Chairman. *Id.* Article II requires the President to maintain "unrestricted removal power" over all federal officials "who wield executive power," subject to two potential exceptions. *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020). However, under the NLRA, the President may only remove Board members "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). These limitations restrict the President's "unrestricted removal power" guaranteed by Article II. *Seila Law LLC*, 591 U.S. at 204.

Board members are only removable "for neglect of duty or malfeasance in office," but not for other causes like inefficiency, which is unconstitutional. *See* 29 U.S.C. § 153(a). The Supreme Court has found this type of restriction on the President's power to be unconstitutional. *See Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) ("The President must be able to remove not just officers who disobey his commands but also those he finds 'negligent and inefficient[.]'" (quoting *Myers v. United States*, 272 U.S. 52, 135 (1926)). Moreover, in *Seila Law*, the Supreme Court specifically held that "the [Consumer Financial Protection Bureau]'s leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers." *Seila Law*, 591 U.S. at 213.

In *Humphrey's Executor v. U.S.*, 295 U.S. 602 (1935), the United States Supreme Court held that there are two exceptions to the President's removal power: "one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. The *Humphrey's Executor* exceptions do not apply here because NLRB Board members "wield substantial executive power," and ALJs possess vast "administrative authority." *Id.*

The Board Members exert executive power in multiple ways. The Board has power to appoint the "executive secretary, and such attorneys, examiners, and regional directors, and other

such employees as it may…find necessary for the proper performance of its duties." 29 U.S.C. §
154. The Board also has the executive power to prevent any person from engaging in an unfair
labor practice, issue subpoenas, engage in rulemaking, conduct union representation elections,
adjudicate representation election disputes, and exercise prosecutorial power in federal district
courts. *See* 29 U.S.C. §§ 156, 160. The Supreme Court has made clear that even when "the
activities of administrative agencies 'take "legislative" and "judicial" forms,' 'they are exercises
of—indeed, under our constitutional structure they must be exercises of—the 'executive Power.'"
*Seila Law*, 591 U.S. at 216 n.2. Because Board Members exert executive authority, the President
must be able to remove them without barriers.

The Supreme Court recognizes this removal power is impermissibly restrained by statutes
that limit the President's ability to remove an executive official, either by restricting who he can
remove, or limiting the rationale for removal. *See Free Enterprise Fund*, 561 U.S. at 495; *Seila
Law*, 591 U.S. at 205; *Collins v. Yellen*, 141 S. Ct. at 1783-84. For example, in *Free Enterprise
Fund*, the Court invalidated a for-cause removal restriction on the members of the Public Company
Accounting Oversight Board. 561 U.S. at 495–96. The officers in question could be removed only
for cause by officers of the Securities and Exchange Commission, who in turn could be removed
only for cause by the President. The Court held that this removal restriction "subvert[ed] the
President's ability to ensure that the laws are faithfully executed" and was thus "incompatible with
the Constitution's separation of powers." *Id*. at 498. Indeed, the Supreme Court stated:

> No one doubts Congress's power to create a vast and varied federal bureaucracy.
> But where, in all this, is the role for oversight by an elected President? The
> Constitution requires that a President chosen by the entire Nation oversee the
> execution of the laws. And the "fact that a given law or procedure is efficient,
> convenient, and useful in facilitating functions of government, standing alone, will
> not save it if it is contrary to the Constitution," for "[c]onvenience and efficiency
> are not the primary objectives—or the hallmarks—of democratic government."

*Free Enter. Fund*, 561 U.S. at 499 (citing *Bowsher v. Synar*, 478 U.S. 736 (1986)) (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983)).

Due to these statutory restrictions, the President does not have unfettered power to remove NLRB Board members in violation of Article II of the Constitution.

### 2.    NLRB ALJs are unconstitutionally insulated from removal.

Article II's Appointments clause also provides the President authority to appoint officers and inferior officers of the United States. *See* U.S. Const. art. II, § 2. ALJs function as inferior officers of an executive agency. *See* U.S. Const. art. II, § 2; *see also Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018); *see also Westrock Servs., Inc.*, 366 NLRB No. 157, slip op. at 1 (Aug. 6, 2018) ("Board judges, like SEC judges, are inferior officers[.]"). Inferior officers "are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions." *Jarkesy v. SEC*, 34 F.4th 446, 464 (2022). The NLRB appoints ALJs, but ALJs may only be removed "for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the [Merit Systems Protection] Board." 5 U.S.C. § 7521(a). Members of the Merit Systems Protection Board ("MSPB") are removable only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). "If principal officers cannot intervene in their inferior officers' actions except in rare cases, the President lacks the control necessary to ensure that the laws are faithfully executed." *Jarkesy*, 34 F.4th at 464.

Based on relevant Fifth Circuit precedent, Dutra is likely to succeed on the merits of its constitutional challenge concerning the NLRB ALJ's removal process. In *Jarkesy*, the Fifth Circuit found the SEC's ALJs unconstitutionally insulated from at least two layers of removal protection. 34 F.4th at 465. The SEC ALJs are also removable by the MSPB. *Id.* If the MSPB finds good cause to remove an SEC ALJ, the Commission must then choose to act on that finding. *Id.* Both the

MSPB and the Commission members also have for-cause removal protection from the President. *Id.* This structure, which was found unconstitutional by the Fifth Circuit, is nearly identical to NLRB ALJs.

The statutes' provision of at least two layers of for-cause removal protections prevents the President from exercising Presidential authority under Article II of the Constitution. Because ALJs can only be removed "for good cause…after opportunity for hearing," and the Merit Systems Protection Board Members who may remove ALJs are themselves removable by the President only for "inefficiency, neglect of duty, or malfeasance in office," ALJs are insulated by the President by at least two layers of for-cause removal protections. As the Supreme Court has held, "the added layer of tenure protection makes a difference…[a] second level of tenure protection changes the nature of the President's review…[t]hat arrangement is contrary to Article II's vesting of the executive power in the President." *Free Enter. Fund*, 561 U.S. at 495-96.

Under the binding Supreme Court and Fifth Circuit precedent, Dutra is not only likely to, but will, prevail on the merits of this claim. Indeed, courts in every other U.S. District Court of Texas have reached this very conclusion when they each granted a preliminary injunction halting NLRB administrative proceedings. See *Space Exploration Techns. Corp. v. NLRB*, No. W-24-CV-00203-ADA, 2024 U.S. Dist. LEXIS 129439, at *9 (W.D. Tex. July 23, 2024) ("under current Fifth Circuit law, there is a substantial likelihood that SpaceX succeeds on the merits with regard to showing that the NLRB ALJs are unconstitutionally protected from removal"); *Energy Transfer, L.P. v. NLRB*, Case No. 3:24-cv-00198, doc. 49 (S.D. Tex. July 29, 2024); *Aunt Bertha v. NLRB*, Case No. 4:24-cv-00798-P, Docket No. 30 (N.D. Tex. Sept. 16, 2024).

Therefore, relevant and binding precedent requires that Dutra succeed on its claim.

### 3. The NLRB's adjudication of private rights and legal relief violates the Seventh Amendment.

The NLRB is statutorily limited to providing public relief to aggrieved parties, but the NLRB recently authorized Regions to seek "private relief," which must be determined by a jury. *See Thryv, Inc.*, 372 NLRB No. 22 at *13-14 (Dec. 13, 2022), enf. denied in part and vacated in part *Thryv, Inc., v. NLRB*, Case No. 23-60132 (5th Cir. May 24, 2024).

The Seventh Amendment protects the right to trial by jury. Specifically, it provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Supreme Court interprets "'Suits at common law' to include all actions akin to those brought at common law as those actions were understood at the time of the Seventh Amendment's adoption." *Jarkesy*, 34 F.4th at 452 (citing *Tull v. United States*, 481 U.S. 412, 417 (1987)). "The term can include suits brought under a statute as long as the suit seeks common-law-like *legal* remedies." *Id.* (emphasis added). The Seventh Amendment "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *SEC v. Jarkesy*, 603 U.S. 110 (2024) (quoting *Parsons v. Bedford*, 3 Pet. 433, 447 (1830)). These cases seeking legal relief "must be tried under the auspices of an Article III Court." *Granfinanciera, S.A. v. Nordberry*, 492 U.S. 33, 41 (1989).

In other words, Dutra is entitled to a jury trial if its adversary seeks *legal* relief against it. "Compensatory damages," or "monetary relief for all losses…sustained as a result of the alleged breach of…duties" are "the classic form of legal relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (emphasis omitted). As the Supreme Court held in *SEC v. Jarkesy*, "it is well established that common law claims must be heard by a jury." *Id.* at 120. Moreover, "[o]nce such

a suit 'is brought within the bounds of federal jurisdiction,' an Article III court must decide it with a jury if the Seventh Amendment applies." *Id.* at 127 (quoting *Stern v. Marshall*, 564 U.S. 462, 484 (2011)).

The NLRA only provides for equitable relief. The NLRA authorized the Board to remedy unfair labor practices through an "order requiring [the] person to cease and desist from such unfair labor practice, and to take…affirmative action including reinstatement of employees with or without back pay." 29 U.S.C. § 160(c) ("Section 10(c)"). Almost 100 years ago, the Supreme Court permitted only reinstatement and backpay under Section 10(c). The Supreme Court reasoned, "because claims seeking statutory remedies for violations of the Act were 'statutory proceedings' that were 'unknown to the common law,' they were not 'suits at common law' within the meaning of the Seventh Amendment." C. Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 569 (2007) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937)). Therefore, the NLRB could continue acting as a factfinder as to claims for monetary relief because the NLRA itself permitted this relief. However, the holding in *Jones & Laughlin Steel Corp.* did not consider far-reaching consequential damages. The Supreme Court explained, "Reinstatement of the employee and payment for time lost are requirements imposed for violation of the statute and are remedies appropriate to its enforcement." 310 U.S. at 48-49.

The Board and its rulemaking agenda has since evolved. Here, the NLRB Complaint seeks "all other relief as may be just and proper to remedy the unfair labor practices alleged," which is a thinly veiled way to encompass consequential damages of an unspecified amount against Dutra. The purpose of Section 10(c) is to make an aggrieved party whole. The statute authorizes *equitable* relief. The statute does not authorize *legal* relief—such as compensatory damages. Despite this clear language, and the fact that the Board directly acknowledged legal damages as "more suited

for the common law of torts and contracts," the Board has allowed consequential or "compensatory" damages to be sought in administrative proceedings. *See Thryv, Inc.*, 372 NLRB No. 22 at *13-14. According to the Board, the consequential damages it permits may include "interest and late fees on credit cards"; "credit card debt"; "early withdrawals from [a] retirement account"; compensation for the loss of a "car or [] home," if the discriminatee is unable to make loan or mortgage payments; "increased transportation or childcare costs"; or "out-of-pocket medical expenses." *Id.* at *9. In an attempt to distance itself from the word "consequential" and avoid finding itself in a battle between public and private rights, the Board explained:

> [W]e stress today that the Board is not instituting a policy or practice of awarding consequential damages, a legal term of art more suited for the common law of torts and contracts. Instead, we ground our decision in the make-whole principles of Section 10(c) of the Act…and our affirmative duty to rectify the harms caused by a respondent's unfair labor practice by attempting to restore the employee to the situation they would have been in but for that unlawful conduct.

*Id.*

Read differently, the Board authorized legal relief by calling it equitable relief so as to stretch its authority. However, as the Supreme Court stated, "[l]iability of one individual to another under the law" is a matter "of private right." *Stern v. Marshall*, 564 U.S. 462, 489 (2011). The Fifth Circuit saw through the veil, referring to remedies requiring "losses incurred as a direct or foreseeable result of" the alleged unlawful action as "novel, *consequential*-damages-like labor law remed[ies]." *See Thryv Inc.*, Case No. 23-60132 at *9 (emphasis added). However, in its decision, the Fifth Circuit did not discuss whether the NLRB could continue to seek these novel consequential damages.

Therefore, the prospect of compensatory damages being sought in the NLRB proceeding continues to unconstitutionally threaten Dutra, and it will suffer irreparable harm if it is found to have violated the NLRA and is ordered to pay impermissible consequential damages.

**4.      The NLRB's Wielding of Executive, Legislative, and Judicial Authority and Power Violates the Fifth Amendment to the Constitution.**

The NLRB is subject to the general due process protections of the Fifth Amendment. *See, e.g.*, *Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("[P]rocedural due process is applicable to the adjudicative administrative proceeding involving the differing rules of fair play, which through the years, have become associated with different types of proceedings."); see also *Securities and Exchange Commission v. Jarkesy*, 144 S. Ct. 2117, 2141 (2024) (Gorsuch, concurring) ("The shift from a court to an ALJ didn't just deprive Mr. Jarkesy of the right to an independent judge and jury. He also lost many of the procedural protections our courts supply in cases where a person's life, liberty or property is at stake.").

The Board's most basic violation of due process stems from its disregard of foundational separation of powers principles. The Board is an executive agency tasked with the enforcement of the Act. 29 U.S.C. § 153. Any "exercise of government power must be consistent with the design and requirements of the Constitution, including those provisions relating to the separation of powers." *Department of Transportation v. Association of American Railroads*, 573 U.S. 43, 54 (2015). Under the Constitution, the judicial power belongs to Article III courts and cannot be shared with legislature or executive. *See Stern*, 564 U.S. at 482. Under "the basic concept of the separation of powers…that flows from the scheme of a tripartite government adopted in the Constitution, the judicial Power of the United States…can no more be shared with another branch than the Chief Executive…can share with the Judiciary the veto power." *Id.* at 483 (citing *United States v. Nixon*, 418 U.S. 683, 704 (1974) (internal citations omitted).

However, "[t]he National Labor Relations Board, uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359,

374 (1998). As Justice Thomas explained in his concurrence in *Axon Enterprises, Inc.*, "[i]t may violate the separation of powers by placing adjudicatory authority over core private rights—a judicial rather than executive power—within the authority of Article II agencies." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 202 (2023) (Thomas, concurring) (quoting *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 171 (2015) (Thomas, dissenting)). But the Board has taken for itself a fundamentally judicial task of overseeing the litigation of parties' private rights.

In addition, the Board's Members have claimed for themselves the fundamentally judicial task of interpreting the NLRA, a task that, in light of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), they can no longer claim is part of a legitimate exercise of executive power. *Id.* at 2257-2258 (reiterating that the interpretation of the law is exclusively the role of the judiciary); *id.* at 2274 (Thomas, J., concurring) (noting that executive agencies' issuance of purportedly binding regulations under the guise of interpreting an ambiguous statute is an unconstitutional exercise of both judicial and legislative power).

In addition, the Board's proceedings lack many of the elements that have traditionally come to be associated with just cause. The Board's processes do not allow for prehearing discovery for a respondent like Dutra in an unfair labor practice proceeding. *See* Casehandling Manual, Part One, Unfair Labor Practice Proceedings, Sect. 10292.4 (January 2025) ("Casehandling Manual") ("The Federal Rules of Civil Procedure providing for compulsory pretrial discovery have been held not applicable to Board proceedings. Any attempt to use such discovery should be resisted.") (citations omitted). The Board, however, gives the government the distinct advantage of access to documents, witness statements, and other information gathered during the investigation of an unfair labor practice charge. *See, e.g.*, Casehandling Manual, Sect. 10334 ("The trial attorney [prosecuting the case on behalf of the General Counsel] has an initial obligation to become familiar

with the contents of all evidence in the investigative file."). This advantage is bolstered by the Board's processes and practices with respect to its subpoena power, including its power to use investigatory subpoenas. *See id.* at Sect. 11770-11808.

By contrast, the Board's processes give a non-Board litigant few (if any) means of obtaining information to prepare its defense prior to trial and defend itself against the Board's prosecution of an unfair labor practice case. The limitations on a party's ability to prepare its defense imposed by the Board are even more draconian than those that gave Justices Gorsuch and Thomas concern in their *Jarkesy* concurrence. In the SEC proceedings at issue in that case, ALJs enjoyed far more latitude to issue subpoenas, and parties could take limited depositions prior to hearing. *Jarkesy*, 144 S. Ct. at 2141 (Gorsuch, J., concurring).

Equally fundamental to due process is the right to have a case determined by a neutral adjudicator—that is, "a fair trial in a fair tribunal." Justice Black put it well in *In re Murchison*:

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that [e]very procedure which would offer a possible temptation to the average man as a judge not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way justice must satisfy the appearance of justice.

*In re Murchison*, 349 U.S. 133, 136 (1955) (internal quotations and citations omitted).

Here, the structure and procedures for NLRB administrative proceedings imminently threaten to violate Dutra's due process rights. In addition to the hearing scheduled to begin in July, the NLRB's process in connection with Coffman's order for a prehearing deposition to be taken

suffers from the same inherent conflict of interest as any proceeding before an agency's in-house ALJ—Coffman, her designated representative, and other attorneys or agents for the NLRB involved in the process ultimately are a part of, and paid by, the same agency bringing the proceedings. *See Jarkesy*, 144 S. Ct. at 2141 (Gorsuch, J., concurring) ("ALJ's . . . remain servants of the same master [as the lawyers who pursue charges on behalf of the agency]—the very agency tasked with prosecuting individuals …. This close relationship, as others have long recognized, can make it extremely difficult, if not impossible, for the ALJ to convey the image of being an impartial factfinder.") (internal citations and quotations omitted).

Simply put, the NLRB's administrative proceedings blatantly ignore the separation of powers and violate Dutra's due process to a fair proceeding and will cause irreparable harm.

### B.  **Dutra will Suffer Irreparable Harm without a Temporary Restraining Order and/or Preliminary Injunction.**

Dutra will suffer immediate and irreparable harm absent injunctive relief. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). "It is well settled that the loss of [constitutional] freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ("[T]he loss of constitutional freedoms for even minimal periods of time…unquestionably constitutes irreparable injury.") (internal citations omitted). Where a constitutional right is "either threatened or in fact being impaired at the time relief was sought," injunctive relief is appropriate. *Elrod*, 427 U.S. at 374. If the NLRB proceeding is allowed to continue, none of the constitutional injuries can be remedied after the fact, which is the very definition of "harm for which there is no remedy at law." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013).

The Supreme Court recognized this in *Axon.* In *Axon*, the plaintiffs sought to enjoin Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") enforcement proceedings by challenging the constitutionality of tenure protection for the FTC's and SEC's ALJs. *Axon Enterp.*, 598 U.S. at 179. In doing so, the Court recognized that the "harm" of "'being subjected' to 'unconstitutional agency authority'—'a proceeding by an unaccountable ALJ'" is an "abstract" harm, but nonetheless a "here-and-now injury." *Id.* at 191. This type of claim is a "here and now injury" because "it is impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Id.* Were the "illegitimate proceeding before an illegitimate decisionmaker" to go forward, "structural constitutional claims would come too late to be meaningful." *Id.* Should the NLRB proceeding go forward, Dutra will lose its right not to undergo an unconstitutional proceeding, an "injury…impossible to remedy once the proceeding is over," and "judicial review of [its] structural constitutional claims would thus come too late to be meaningful." *Axon Enterp.*, 598 U.S. at 175.

As noted in *Space Exploration Technologies*, "[t]his is not an issue of first impression before this court." 2024 U.S. Dist. LEXIS 129439, at *19. "[H]aving to proceed before an unaccountable [NLRB] ALJ is an irreparable injury in the context of a Preliminary Injunction pursuant to a ALJ removal protection claim, as is a claim of being subjected to the authority of the unaccountable NLRB Members." *Id.* at *19-20. *Accord Energy Transfer, L.P. v. National Labor Relations Board*, Case No. 3:24-cv-00198, doc. 49, slip op. 7-9 (S.D. Tex. July 29, 2024).

Additionally, although unnecessary to support this Motion, Dutra stands to suffer economic harm from the unconstitutional proceedings. Responding to the charges and preparing for the imminent deposition and upcoming hearing has required, and will continue to require, extensive preparation by Dutra and its counsel, diverting its resources and . Moreover, the NLRB proceeding

could harm Dutra's reputation, despite the fact that most of the employees who work on its dredges, boats, and equipment are members of and/or covered by an agreement with unions. As the Fifth Circuit noted in *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017), a "decision pursuant to a constitutionally infirm hearing that injured petitioner's reputation" was "sufficient to satisfy irreparable injury."

Dutra faces irreparable constitutional and economic harm should this hearing move forward.

C.    **The Balance of Equities Tips in Dutra's Favor and Injunctive Relief is in the Public Interest.**

Measuring the harm against Defendants, the balance of equities tips strongly in Dutra's favor. Where "the Government is the opposing party," the "harm to the opposing party and the public interest" factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

First, given the high likelihood of success on the merits, an injunction would not harm Defendants because the government does not suffer a cognizable harm from "stopping the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. A preliminary injunction would do the NLRB "no harm whatsoever." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). "Any interest [the NLRB] may claim in enforcing an unlawful (and likely unconstitutional)" proceeding is "illegitimate." *Id.*; *see also Luhan v. U.S. Dep't of Educ.*, 664 F. Supp. 3d 701, 722 (W.D. Tex. 2023) ("Finally, and most importantly, the Department has no interest in enforcing a regulation that likely conflicts with Congress's unambiguous statutory mandate"). In contrast, as described in the previous section, the harm to Dutra is irreparable because, once concluded, the effects of the hearing cannot be "undone." *Axon Enter.*, 598 U.S. at 191.

Second, a preliminary injunction best serves the public interest. There can be little room for debate that "the public interest is served when the law is followed." *Daniels Health Scis.*, *LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir., 2013). "The public interest is…served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions—even, or perhaps *particularly*, when those decisions frustrate government officials." *BST Holdings, LLC*, 17 F.4th. at 618-19. And it is not in the public interest to have an increasingly expansive and unaccountable administrative state that "slip[s] from the Executive's control, and thus from that of the people." *Free Enter.*, 561 U.S. at 499. Nor is it in the public interest to have an increasingly expansive and unaccountable administrative state that infringes on the authority of Article III courts. *Stern v. Marshall*, 564 U.S. 462, 483 (2011).

Even if the Court grants a temporary restraining order and/or preliminary injunction, but determines the NLRB's proceedings are constitutional, Defendants could move forward with the unfair labor practice proceedings at that time. The NLRB Complaint was not issued until more than a year after the alleged underlying unfair labor practices. A temporary restraining order and preliminary injunction would merely require the NLRB to stay its proceedings while this Court makes its determination. While Dutra may suffer economic losses and constitutional deprivation, the Defendants simply do not stand to lose anything.

## IV.    CONCLUSION

For the foregoing reasons, Dutra respectfully requests the Court to enter a temporary restraining order and/or preliminary injunction against the NLRB's ongoing administrative proceeding against Dutra.

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Audrey F. Momanee*
Audrey F. Momanee
Texas Bar No. 24055993
717 Texas Avenue, Suite 1400
Houston, TX 77002
Tel. 713-632-8613
audrey.momanee@blankrome.com

Andrew I. Herman, Esquire
Pennsylvania Bar No. 317094
(*pro hac vice* motion forthcoming)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Tel. 215-569-5574
Fax. 215-832-5822
andrew.herman@blankrome.com

**Attorneys for Plaintiff The Dutra Group**